FILED
CLERK, U.S. DISTRICT COURT
3/29/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2024 Grand Jury

| UNITED STATES OF AMERICA, | CR No. 2:24-cr-00214-MEMF |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1957: Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity; 18 U.S.C. § 982: Criminal Forfeiture] |
| YURI KHATCHIKYAN, aka "Ghost," and YELENA KARAPETYAN, | |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Defendants YURI KHATCHIKYAN, also known as "Ghost," and YELENA KARAPETYAN were residents of Los Angeles, California. Defendants KHATCHIKYAN and KARAPETYAN are married to each other.

2.   Yuriy Khatchikyan ("Yuriy Khatchikyan") was a sole proprietorship controlled by defendant KHATCHIKYAN.

3.  Lodestar Logistics, Inc. ("Lodestar") was an S corporation controlled by defendants KHATCHIKYAN and KARAPETYAN.

4.  Harvest Small Business Finance, LLC ("Harvest Small Business Finance") was a lender serving small business borrowers approved by the Small Business Administration ("SBA").

5.  Defendants KHATCHIKYAN and KARAPETYAN controlled a joint personal checking account with Bank of America (the "Joint Checking Account").

6.  Defendants KHATCHIKYAN and KARAPETYAN controlled a business checking account in the name of Lodestar Logistics, Inc. with Bank of America (the "Lodestar Account").

<u>The Economic Injury Disaster Loan Program</u>

7.  The SBA administered the Economic Injury Disaster Loan Program ("EIDL") to provide low-interest financing to small businesses affected by declared disasters. In or about March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which authorized the SBA to provide EIDL loans of up to $2,000,000 to eligible small businesses experiencing substantial financial disruption as a result of the COVID-19 pandemic.

8.  To obtain an EIDL loan, a qualifying small business was required to submit a loan application through the SBA's online web portal. In the EIDL loan application, the applicant was required to provide, among other information, the gross revenue for the twelve months preceding January 31, 2020.

9.  As part of application and to be eligible to obtain the EIDL loan, the applicant was required to answer various background questions and make certain certifications under penalty of perjury. One such background question asked whether, within the past five

years, for any felony, the applicant had been "convicted, plead guilty, plead nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation (including probation before judgment)." The applicant was also required to certify that "all information in [the] application and submitted with [the] application [was] true and correct to the best of [the applicant's] knowledge" and that the applicant would "submit truthful information in the future." The application included a warning that "any false statement or misrepresentation to the SBA [could] result in criminal . . . sanctions including, but not limited to . . . fines and imprisonment, or both."

10. After being approved for an EIDL loan by the SBA and before receiving disbursement of the loan, the applicant was required to sign a "Loan Authorization and Agreement" in which the applicant agreed to use all EIDL loan proceeds "solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter" and to pay certain Uniform Commercial Code filing fees and handling charges.

## The Paycheck Protection Program

11. As part of the CARES Act, Congress also authorized $600 billion in forgivable loans through the Paycheck Protection Program ("PPP"). Through the PPP, the SBA would facilitate loans to small businesses to pay up to eight weeks of payroll costs, interest on mortgages, rent, and utilities.

12. Small businesses and sole proprietorships could apply for PPP relief through one of over 4,900 SBA-designated lending institutions. The application required applicants to complete and transmit to the lender an SBA Form 2483, which required the applicant

3

to identify the entity's average monthly payroll and certify that "[t]he Applicant was in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors," that "[c]urrent economic uncertainty ma[de] this loan request necessary to support the ongoing operations of the Applicant," and that "[t]he funds [would] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under [PPP] Rules." The applicant was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."

13. The PPP loan application required the small business, through its authorized representative, to state, among other things, its number of employees and average monthly payroll expenses. Those figures were used to calculate the amount of money the small business was eligible to receive under the PPP. Businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

14. Once a borrower provided the lender its application, including the requisite certifications, the lender would underwrite the loan and transmit the application to the SBA via an electronic platform. Loans guaranteed under the PPP were 100% guaranteed by the SBA. The full principal amount could qualify for loan forgiveness, provided at least 75% of the loan amount was used for payroll costs.

B. THE OBJECT OF THE CONSPIRACY

15. Beginning no later than in or around July 2020 and continuing through at least in or around June 2021, in Los Angeles County, within the Central District of California, defendants

4

KHATCHIKYAN and KARAPETYAN conspired with each other and with others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C. <u>THE MANNER AND MEANS OF THE CONSPIRACY</u>

16. The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

   a. Defendants KHATCHIKYAN and KARAPETYAN would apply electronically to the SBA and lenders for EIDL and PPP loans for their purported businesses, including Lodestar and Yuriy Khatchikyan.

   b. To create the false appearance that Lodestar was legitimate, defendants KHATCHIKYAN and KARAPETYAN would update Lodestar's business filings on the California Secretary of State site and would open the Lodestar Account.

   c. In submitting their EIDL and PPP loan applications, defendants KHATCHIKYAN and KARAPETYAN would intentionally make and cause to be made false statements to the SBA and other lenders, including false representations regarding their businesses' gross revenues and regarding defendant KHATCHIKYAN's criminal history and false certifications that the loan funds would be used for permissible business purposes. Defendant KHATCHIKYAN would also cause to be submitted false documents, including false and fictious tax documents.

   d. At the time of these applications, defendants KHATCHIKYAN and KARAPETYAN knew that the representations in their applications, including the representations regarding their businesses' gross revenues, were false, and that certain tax documents submitted in support of those applications were fraudulent. In making these false representations and submitting these fabricated

documents, defendants KHATCHIKYAN and KARAPETYAN intended that the SBA and lenders would rely on those representations and documents to approve their applications and the amount to be disbursed.

  e. Defendants KHATCHIKYAN and KARAPETYAN would cause the SBA and lenders to deposit funds into the Lodestar Account and the Joint Checking Account.

  f. Defendants KHATCHIKYAN and KARAPETYAN would then use the fraudulently obtained loan proceeds for their own personal benefit, including to purchase a home and for expenses prohibited under the requirements of the PPP and EIDL programs.

D. <u>OVERT ACTS</u>

  17. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants KHATCHIKYAN and KARAPETYAN, together with others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, within the Central District and elsewhere:

  <u>Overt Act No. 1</u>: On July 3, 2020, defendant KARAPETYAN filed a Statement of Information for Lodestar with the California Secretary of State, listing the business as a "Truck Transportation" business and listing herself as the Chief Executive Officer, Secretary, Chief Financial Officer, Director, and Agent for Service of Process.

  <u>Overt Act No. 2</u>: On July 3, 2020, defendant KARAPETYAN electronically submitted an EIDL application for Lodestar, in which she falsely represented that Lodestar had been established in 2018 and had 2019 gross revenues of $314,000.

  <u>Overt Act No. 3</u>: On July 10, 2023, defendants KHATCHIKYAN and KARAPETYAN opened the Lodestar Account, listing defendant KARAPETYAN

as the president of the corporation and defendant KHATCHIKYAN as a signer.

Overt Act No. 4:   On July 13, 2020, defendant KARAPETYAN called the SBA to check on the status of the EIDL application for Lodestar.

Overt Act No. 5:   On July 20, 2020, defendant KARAPETYAN called the SBA to check on the status of the EIDL application for Lodestar.

Overt Act No. 6:   On July 23, 2020, defendant KARAPETYAN electronically signed a loan agreement between Lodestar and the SBA in which she (1) certified that all representations in her application were true, correct, and complete; (2) agreed to use all loan proceeds solely as working capital to alleviate economic injury caused by the COVID-19 pandemic; and (3) agreed not to use, directly or indirectly, any portion of the Loan to relocate without the prior written permission of SBA.

Overt Act No. 7:   On July 24, 2020, defendant KHATCHIKYAN electronically submitted an EIDL application for Yuriy Khatchikyan in which he falsely represented (1) that Yuriy Khatchikyan was a tractor trailer transportation business established in 2018 that had 2019 gross revenues of $315,000; and (2) that within the last five years, he had not been convicted, pled guilty, pled nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation for any felony.

Overt Act No. 8:   On July 24, 2020, defendant KHATCHIKYAN electronically signed a loan agreement between Yuriy Khatchikyan and the SBA, in which he certified that all representations in his application were true, correct, and complete, and agreed (1) to use

all loan proceeds solely as working capital to alleviate economic injury caused by the COVID-19 pandemic; and (2) not to use, directly or indirectly, any portion of the loan to relocate without the prior written permission of SBA.

Overt Act No. 9:  On August 3, 2020, defendants KHATCHIKYAN and KARAPETYAN accepted from the SBA a transfer of approximately $144,900 into the Lodestar Account based on the fraudulent July 3, 2020 loan application and fraudulent July 23, 2020 loan agreement.

Overt Act No. 10:  On August 4, 2020, defendants KHATCHIKYAN and KARAPETYAN accepted from the SBA a transfer of approximately $144,900 into the Joint Checking Account based on the fraudulent July 24, 2020 loan application and July 24, 2020 loan agreement.

Overt Act No. 11:  On September 29, 2020, defendants KHATCHIKYAN and KARAPETYAN purchased real property, namely, 15921 Foothill Blvd., Sylmar, California, using the proceeds of the fraudulently obtained EIDL loans discussed above.

Overt Act No. 12:  On May 20, 2021, defendant KHATCHIKYAN electronically submitted a PPP loan application to various lenders, including Harvest Small Business Finance, in which he sought $20,833 to cover payroll costs for Yuriy Khatchikyan.  With the application, defendant KHATCHIKYAN submitted a fictitious 2020 IRS Form Schedule C – Profit or Loss From Business showing business gross revenues of $103,251 for 2020, which defendant KHATCHIKYAN knew to be fabricated. In submitting the PPP application, defendant KHATCHIKYAN falsely represented (a) that within the last five years, he had not been convicted, pled guilty, pled nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation for any felony; and (b) that all information provided in the application and

supporting documentation was true and accurate in all material respects.

<u>Overt Act No. 13</u>:  On June 1, 2021, defendants KHATCHIKYAN and KARAPETYAN accepted from Harvest Small Business Finance a transfer of approximately $20,833 into the Joint Checking Account based on the fraudulent May 20, 2021 loan application.

COUNTS TWO THROUGH FOUR

[18 U.S.C. §§ 1343, 2(a)]

[ALL DEFENDANTS]

18. The Grand Jury re-alleges paragraphs 1 through 14 and 16 through 17 of this Indictment here.

A. THE SCHEME TO DEFRAUD

19. Beginning no later than in or around July 2020, and continuing until at least in or around June 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHATCHIKYAN and KARAPETYAN, together and with others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly and with intent to defraud devised, intended to devise, and participated in a scheme to defraud the SBA and other lenders and to obtain money and property by means of material false pretenses, representations, and promises, and the concealment of material facts.

20. The fraudulent scheme operated and was carried out, in substance, as described in paragraph 16 of this Indictment.

B. USE OF THE WIRES

21. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants KHATCHIKYAN and KARAPETYAN, each aiding and abetting the other, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of the following items by means of wire communications in interstate commerce:

//
//
//

| COUNT | DATE | ITEM TRANSMITTED BY WIRE |
|---|---|---|
| TWO | 7/23/2020 | Loan Authorization and Agreement for EIDL loan in the name of Lodestar submitted by means of interstate wires from the Central District of California to the SBA |
| THREE | 7/24/2020 | Loan Authorization and Agreement for EIDL loan in the name of Yuriy Khatchikyan submitted by means of interstate wires from the Central District of California to the SBA |
| FOUR | 5/20/2021 | Submission of PPP loan application in the name of Yuriy Khatchikyan to Harvest Small Business Finance via a server outside the State of California |

COUNT FIVE

[18 U.S.C. §§ 1957(a), 2(a), 2(b)]

[ALL DEFENDANTS]

On or about September 29, 2020, in Los Angeles County, within the Central District of California, defendants YURI KHATCHIKYAN, also known as "Ghost," and YELENA KARAPETYAN, each aiding and abetting the other, knowing that the property involved represented the proceeds of some form of unlawful activity, knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000, which property, in fact, was derived from specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, as charged in Counts Two and Three of this Indictment, in that defendants KHATCHIKYAN and KARAPETYAN caused approximately $90,813.31 to be transferred to an escrow company on their behalf to close their purchase of real property located at 15921 Foothill Blvd., Sylmar, California.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(2)]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction of the offenses set forth in any of Counts One through Four of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(1)]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of the offense set forth in Count Five of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in

14

committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

                                        A TRUE BILL

                                         /s/
                                        Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

SCOTT M. GARRINGER
Assistant United States Attorney
Deputy Chief, Criminal Division

BENEDETTO L. BALDING
Assistant United States Attorney
Deputy Chief, General Crimes Section

KATHRYNNE N. SEIDEN
Assistant United States Attorney
Terrorism and Export Crimes Section