

Warning
As of: May 20, 2024 6:58 PM Z

# People v. Abrahamyan

Court of Appeal of California, Second Appellate District, Division One

April 24, 2012, Opinion Filed

B223942

**Reporter**
2012 Cal. App. Unpub. LEXIS 3067 *; 2012 WL 1406860

THE PEOPLE, Plaintiff and Respondent, v. HARUTYUN ABRAHAMYAN, Defendant and Appellant.

**Notice:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**Subsequent History:** Review denied by People v. Abrahamyan (Harutyun), 2012 Cal. LEXIS 7005 (Cal., July 18, 2012)

**Prior History:** [*1] Appeal from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. GA070225. Steven K. Lubell, Temporary Judge. Pursuant to Cal. Const., art. VI, § 21.

**Disposition:** Affirmed.

## Core Terms

gun, shooting, self-defense, shots, conversations, answered, fool, firearm, message, trial court, fired, responded, talking, walked, kill, attempted murder, shooter, aggressor, passenger, drove, pages, instructions, replied, misconduct, exhibits, objected, casings, fight, hit, police officer

**Counsel:** Law Offices of Pritz & Associates and Danalynn Pritz for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Taylor Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

**Judges:** JOHNSON, J.; MALLANO, P. J., CHANEY, J. concurred.

**Opinion by:** JOHNSON, J.

## Opinion

A jury convicted Harutyun Abrahamyan of attempted murder, shooting at an occupied motor vehicle, possession of a firearm by a felon, and firearm enhancements. The trial court sentenced Abrahamyan to 20 years to life in state prison. Abrahamyan appeals, arguing that there was insufficient evidence that he did not act in self-defense, that jury instructions were not supported by substantial evidence, that the prosecutor committed misconduct, that the trial court abused its discretion in admitting evidence, and that his counsel was ineffective. We affirm.

### BACKGROUND

An information filed February 29, 2008 charged [*2] Abrahamyan with the attempted willful, deliberate, and premeditated murder of Yuri Khachikyan (count 1) and of Armen Sargsyan (count 2), each in violation of Penal Code [1] sections 664 and 187, subdivision (a); shooting at an occupied motor vehicle, in violation of section 246 (count 3); and possession of a firearm by a felon, in violation of section 12021, subdivision (a)(1) (count 4). The information also alleged as to counts 1, 2, and 3 that Abrahamyan personally and intentionally discharged a handgun, in violation of section 12022.53, subdivisions (b), (c), and (d). All the counts were based on events occurring on June 26, 2007.

───────────────────────

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Case 2:24-cr-00214-MEMF Document 42-1 Filed 05/20/24 Page 2 of 13 Page ID #:160

Page 2 of 13
2012 Cal. App. Unpub. LEXIS 3067, *2

Abrahamyan moved to suppress evidence pursuant to *section 1538.5*, and after a hearing the trial court denied the motion. During a jury trial, the court granted Abrahamyan's *section 1118.1* motion to dismiss the firearm use allegation under *section 12022, subdivision (d)*, as to all counts. Upon the prosecution's motion, the trial court dismissed count 2 (attempted murder of Armen Sargsyan) under *section 1385*. On September 8, 2009, the jury convicted Abrahamyan of the remaining [*3] counts of attempted murder (count 1), shooting at an occupied motor vehicle (count 3), and possession of a firearm as a felon (count 4), and found true the remaining firearm use allegations. On February 25, 2010, the trial court denied Abrahamyan's motion for a new trial and to reduce the verdict to voluntary manslaughter.

The trial court denied probation and sentenced Abrahamyan to 20 years to life in state prison, as follows: on count 1, attempted murder, a life term enhanced by 20 years for the firearm allegation under 12022.53, subdivision (c); on count 3, shooting at an occupied motor vehicle, a concurrent term of five years, and a consecutive 20-year term for the firearm allegation under *section 12022.53, subdivision (c)*; on count 4, possession of a firearm by a felon, a concurrent term of two years. The court stayed the sentences on the remaining firearm allegations, and imposed fines and fees.

Abrahamyan timely appealed.

**I. The evidence at trial**

**A. Prosecution case**

Ermine Khacheryan testified that between 4:00 p.m. and 5:00 p.m. on June 26, 2007, she went to Brand Park in Glendale for a picnic with her friends Keyso (Kristina Kababchyan), Vicki (Viktoria Muradyan), and Diana (Karine [*4] Diana Muradyan), [2] in Keyso's black Cadillac. The friends were "hanging out," in and out of the Cadillac, when Yuri Khachikyan (also known as "Ghost") and someone she knew only as his cousin came to meet them. Ermine knew Yuri as a dangerous person and a police informant, but on the phone she had told him to come over and hang out, thinking it was safe at the park in daylight. On the phone, Yuri told her

---

[2] We use some of the witnesses' first names, as do the briefs in this case, for ease of reference. We intend no disrespect.

he was "strapped," meaning that he had a gun.

The two men stood by the Cadillac talking for five to 10 minutes. A white Infiniti driven by Abrahamyan, [3] or "Snoopy," drove up, words were exchanged ("What's up, bitch" from the car), and Yuri, pulling out a black gun, walked towards the car. Abrahamyan fired five shots out the front passenger window. Ermine did not see who fired the shots, but the shots came from the Infiniti, about five rounds. Yuri ran down the hill; there were three bullets in the Cadillac. The white Infiniti drove off, and Yuri and his cousin jumped into their car and chased after it. After the shooting, Ermine (MySpace name: Sikwidit) had communicated [*5] with Abrahamyan on MySpace, asking him what he was doing shooting at them, and Abrahamyan responded, "you shouldn't hang out with people like that." Yuri had "dissed" Abrahamyan in a rap song.

Glendale Police Officer Jeff Newton testified that he interviewed Ermine at her home on July 10, 2007 while serving a search warrant for her computer, and asked her about the MySpace communication with Abrahamyan. She said she was scared of retaliation for talking to the police about the shooting, and told Officer Newton that it was Abrahamyan in the Infiniti with another person she could not identify. Ermine told Officer Newton that Abrahamyan had fired around five rounds, and Yuri had provoked the [*6] shooting by writing and performing a rap song "putting down Snoopy's gang." She said that Snoopy said, "'What's up, bitch,'" and then as Yuri and another man walked up to the Infiniti, shots came from the car. Ermine did not tell the police that Yuri had a gun.

Officer Newton had also spoken to Ermine on the day of the shooting, and she had not told him everything (including that Abrahamyan was there and fired the shots) at that time because she was afraid. In a chat between Ermine and Abrahamyan four days after the shooting, Abrahamyan said the rounds got so close to her because he didn't see her.

Armen Sargsyan testified that he went to Brand Park

---

[3] Abrahamyan's father testified the Infiniti was his, but his son also used it at the time of the shooting at Brand Park in June 2007. A Pasadena police officer testified that during a search of the Abrahamyans' residence on July 5, 2007, he saw Infiniti keys hanging on a wall, depressed the alarm button, and activated the alarm of a white Infiniti SUV parked outside the house. Abrahamyan's father at first denied that he possessed the vehicle and said it was rarely driven and belonged to a relative.

with Yuri on the afternoon of June 26, 2007. He was standing on the curb by the Cadillac, talking to one of the girls, when he heard gunshots. He turned around and saw a white SUV driving away. He did not see a gun, or hear anything said before the shooting. He rode off with Yuri after the shooting. Armen had seen Yuri with a gun before that day, but had never seen him use it.

Victoria Muryadyan (Vicki) testified that she was in the car with Kristina (Keyso) when Yuri arrived at Brand Park. The other two girls were outside talking to Yuri [*7] when a white Infiniti showed up and drove by, slowing without coming to a complete stop. She heard someone inside the car say something like "Hey fool," or "What's up, homey." Yuri walked toward the car, reached into his waist and got a black object that looked like a gun. She heard four or five shots and saw a black and silver gun on the passenger side of the Infiniti; she did not see the driver's face. This testimony at trial was the first time Vicki ever mentioned that Yuri had a gun. After the shooting, Vicki (MySpace name: Sweetest Sin) talked to Abrahamyan on MySpace, telling him she could not forget "the way you took out the gun and said 'What's up, fool' and started shooting." Vicki later identified Abrahamyan as the shooter in a six-pack of photographs. Her identification was based on Yuri's statement that Abrahamyan was the shooter. She did not know Yuri, but she knew he was a "scary person" and that on the day of the shooting he had told Ermine he was "strapped." She had seen Yuri with a gun before, and he "always brags" that he carries a gun.

Karine Diana Muradyan (Diana) testified that she saw Yuri for the first time that day at Brand Park. While Yuri was talking to Diana [*8] and another girl, the white Infiniti drove by slowly and Yuri walked toward it. Yuri was taking something out of his waistband, but she couldn't see what. She saw a gun sticking out of the passenger side of the Infiniti and she stayed in the car and ducked. Diana could not see who was inside the Infiniti; she heard cursing, but could not make out the words. This was the first time she ever had told anyone that Yuri pulled something out of his waistband; she had not told the police officers because she was scared.

Glendale Police Officer Craig Tweedy went to Diana and Vicki's home to serve a search warrant on July 10, 2007. He spoke to Vicki about the Brand Park shooting. After he told her that he had seen her MySpace communications, Vicki told him Snoopy was the driver of the Infiniti, who said, "'What's up, fool'" to "Ghost," and then fired shots. She identified Snoopy in a photographic lineup. She had not identified Snoopy as the shooter at first, because she was afraid of retaliation. Officer Tweedy then spoke to Diana, who told him that the driver of the car did the shooting, and that Vicki had told her the shooter was Snoopy.

Glendale Police Officer Rafael Quintero testified that [*9] on July 5, 2007, he went to Abrahamyan's home for a probation compliance check and placed Abrahamyan under arrest. He and Officer Nikita Orloff transported Abrahamyan for a probation violation. Abrahamyan asked why his probation was violated, and Officer Orloff answered that he was being booked on attempted murder. Abrahamyan responded "that he had never touched the gun in his life," although there had been no mention of a gun.

Officer Orloff testified that he was present on that day and participated in the search of Abrahamyan's home. In Abrahamyan's bedroom he found a shirt and a cap, both with the word Snoop on them. Officer Orloff also found a black toiletry bag, containing a single live 9-millimeter round with a unique circular stamp on the upper casing, the same stamp on shell casings recovered after the Brand Park shooting. He interviewed Armen recently when he served a subpoena, and Armen told him that the defense attorney kept asking him whether Yuri was armed at Brand Park. Armen said that if Yuri had had a gun he would have used it, meaning that he did not have a gun at that time. Officer Orloff knew Yuri, who had a reputation for violence in the community, had shot at people, [*10] and had gone to prison for assault with a firearm.

Yuri testified that he went to Brand Park on June 26, 2007 to see Ermine (in the transcript as Armine). He was talking to Ermine outside the back passenger side of the Cadillac when a white SUV stopped for a moment. Yuri approached the SUV, and shots came from the front passenger side. He was "high out of my mind" on marijuana that day and did not know what he was doing or what was going on. Yuri could not see who was in the car (he just saw "two bald heads"). [4] One of them said something and Yuri answered, "Get out of that car, f, or something like that." He caught a glimpse of a gun, turned around, and started running downhill toward the playground area. Yuri testified that on June 26, 2007, he had no face, neck, or head tattoos. At the

---

[4] Yuri admitted that at the preliminary [*11] hearing, he identified Abrahamyan as the driver and the person who shot at him, and he had told the police that "Skinny" was the other person in the car.

time of his testimony, he had a tattoo on his forehead saying "Green-Eyed Devil" and two tattoos saying "LA," one on his head and one on his cheek. Yuri explained that the forehead tattoo was his rapping moniker, and the other tattoos were just the city he was from. Another tattoo, "'SOB,'" referred to a record label, "Slash Crew." None of the tattoos was gang related.

Yuri left the park because he was afraid that if the police caught him, either he would have violated his probation, or he would have to testify. He did not want to be in court or to testify that day. Yuri did not want to talk about who did the shooting at Brand Park, because he feared for his life and that of his family, and three or four men had threatened him at gunpoint that they would kill his child and the child's mother if Yuri went to the police. Yuri knew Abrahamyan had possessed a white SUV like the one at the park.

Yuri admitted he had been convicted of assault with a firearm and three counts of armed robbery in April 2002. In July 2007, he violated his parole by carrying two firearms and went back to jail, but he had not carried a firearm since his release in May 2008. He had been arrested twice recently, but the charges were dropped.

Yuri was in the habit of carrying firearms at the time of the shooting at Brand Park. On the day of the shooting, however, Yuri did not have a gun; he had no reason to carry one, as he was "just [*12] going to see a female friend." He knew Abrahamyan, and had a dispute with him when the mother of Yuri's child told Yuri that Abrahamyan was trying to plant drugs in her car. Yuri and Abrahamyan had multiple misunderstandings and arguments, but he was not angry enough to try to harm Abrahamyan. Yuri knew that on May 27, 2007, Abrahamyan had been shot at in Pasadena near Abrahamyan's home, but Yuri was not the shooter.

Kristina Kababchyan (Keyso), the owner of the Cadillac, testified that she drove it to Brand Park with her three friends on June 26, 2007. She had never seen Yuri before that day, when she learned from Armen that his nickname was "Ghost." Yuri arrived, and Ermine was outside the car with him when a white SUV showed up. The SUV stopped, and words were exchanged after Yuri walked up to the SUV. "When Yuri walked up to the car, I saw that he had a gun on him, what looked like a gun," held down by his side. She then heard talking and screaming, and whoever was in the white SUV fired gunshots out the front passenger window; Yuri ran. Three shots hit her car.

After the SUV drove away, Vicki said, "'That was the homie Snoops.'" Although Keyso had circled Abrahamyan's photograph [*13] in a field show-up that day, at trial she testified that she was forced to circle somebody by the police, and had circled his photograph at random. It was "just coincidence" that she told the police she had heard the shooter was Snoops. Keyso had not said anything to the police about Yuri having a gun on the day of the shooting or in a later interview at her home, because she didn't know for sure. She had told her mother that Yuri had a gun, but no one else. She was afraid of Yuri and wanted nothing to do with him.

Armine G. testified that she was hanging out with friends on the steps of the basketball court at Brand Park on the day of the shooting. She heard a car rolling up and then gunshots, and told the police that the person pointing the gun was shooting at two men walking down the hill toward the playground. Nobody was standing by the car at the time the shots were fired.

Pasadena Police Officer David Duran testified that on May 21, 2007, he responded to a shooting call on Del Rey Avenue in Pasadena, outside Abrahamyan's residence. Abrahamyan was standing on the street with two other individuals. Officer Duran and his partner found shell casings on the street. Abrahamyan told them [*14] he was standing outside when he heard someone say, "Fuck," and he looked up to see a stopped Honda. A Hispanic male with a dark-colored bandanna over his face, sitting in the rear passenger seat, leaned halfway out the window and fired about 10 shots at him and a friend. A forensic specialist for the Pasadena Police Department testified that he went to the scene of the Pasadena shooting and recovered eight nine-millimeter shell casings.

Glendale Police Department Officer Tracy Lowrey testified that she went to Brand Park on the day of the shooting in response to a call. She interviewed Armine G., who said she heard three shots, looked up, and saw a male in the front passenger seat of a white vehicle pointing a gun out the window toward a playground area. Two young males were headed in that direction. Another witness told Officer Lowrey that she heard the shooter say afterwards, "'Hurry. Hurry,'" to the driver. Neither witness said she saw someone outside a vehicle with a gun.

A forensic specialist with the Glendale Police Department testified that two cartridge cases and a projectile were found at Brand Park, and both cases were stamped 9-by-19 millimeter. The casings were

from an automatic [*15] weapon.

### 1. MySpace evidence

Glendale Police Officer Richard Phillips testified that he examined the hard drive of a computer seized from Abrahamyan's home and located MySpace conversations pertaining to the Brand Park shooting. He testified that People's exhibit 11, which was 57 pages long, included the entire series of communications in a conversation, because each reply message would contain the message to which the sender was responding. The exhibit included conversations between "Decipleochaos" and "Snoopy Free Blue Eyez & Looney." "'LOL'" meant "'laughing out loud,'" and "'LMAO'" meant "'laughing my ass off.'"

Glendale Police Officer Petros Kmbikyan testified that a MySpace conversation in People's exhibit 13 on June 30, 2007 (four days after the shooting) was between Snoopy Free Blue Eyez (or S) and Crazy Queen (or KQ), who said, "Hey, I heard what you did to Lil Ghost or whatever at Brand Park. Give you props. Fuck that foo." Snoopy Free Blue Eyez responded, "Thanks. Fuck that internet banger."

Exhibit 14 was conversations over two days, July 2 and 3, 2007, between Deciple of Chaos, who stated, "Guess who?" Snoopy Free Blue Eyez responded, "Who?" and Deciple replied, "Da girl whose [*16] car you put holes in. LMAOOO. How you doing?" Snoopy answered, "Oops. I'm sorry. LOL."

People's exhibit 15, an exchange between Snoopy and Ms. Flirt on July 1 and 2, 2007, showed Snoopy saying, "That bitchass fool snitched me out. I think Ima leave Pasadena tomorrow." When Ms. Flirt said she wanted to come over, Snoopy replied, "Don't trip homie. Juss go to sleep. My dad knows. He's tripping on R. I can't get out da or else I would see you. I know some foo dat for? Glendale City. He knows everything about what cracks in Glendale. He called to da dat. He saw the report. It said da shooter was Harutyun Abrahamyan, AKA Snoopy." On July 3, 2007, Snoopy told Ms. Flirt, "I just been running around these two days. I got to go bust a mission today. Some things have to be handled before I go anywhere." Ms. Flirt later asked, "Did you hear the track that bitch ass mothafucka put today? Fucking bitch ass fool that mothafuka. Truth is on it to." Snoopy replied, "LOL. Na. What does it say? Ms. Flirt answered, "Just go listen to it. He says something about your mom. I didn't want to be the one telling because I know as soon as you heara this you're about to go crazy. That's why I was worried because [*17] I thought you would have by now. He crossed the line." Snoopy rejoined, "It won't load but I don't really give a fuck about what dat bozi tava [Armenian for son of a bitch] go say. We was speechless when he saw me in person. [¶] . . . [¶] Fukkin snitchass fool. I swear to god I'm kill that fool homie." Ms. Flirt answered, "He deserves every bullet that's going to hit him. LOL." Snoopy replied, "Hell yeah homie."

People's exhibit 16, a conversation between Snoopy and Sweetest Sin (Vicki's MySpace name), included Sweetest Sin asking, "What was up with you at Brand Park? N-I-K-K-K-A, L-O-L-L-L." Snoopy answered, "How do you know? Were you there?" Sweetest Sin answered, "Yeah. You almost hit me, but I ducked." Snoopy replied, "W-T-F, 'What the F,' LOL. Are you serious?" Sweetest Sin responded, "Yeah, man. Fuck. I didn't sleep all night, Snoop. I woke up, went to church. You have any idea LOL. What's up with you an Ghost. Yeah. People think I set Ghost up because I'm cool with you. LOL." Snoopy answered, "LOL fuck. Fuck that bozi tava. Der's nothing up with us. I just wanna kill that fool." Sweetest Sin rejoined, "Oh, wow, Snoop. You missed but you got four bullet holes on my friend's car. [*18] LOL. Did you guys get pulled over?" Snoopy answered, "No, I didn't. I wouldn't be talking to you if I did." Sweetest Sin responded: "LOL. They said you did but you got away. LOL." Snoopy rejoined, "LOL, na, I didn't. Why the fuck are you kicking it with that snitchass fool anyways?" Sweetest Sin answered, "No, hun. I wasn't kicking it with him. We were posted up there then he called the home girl, said 'Where you at? I'm coming.' Ay Snoop, how did you know he was there? Hey, I.M. me at gangstagrl144rm818. We'll talk there. Yeah?" Snoopy replied, "I don't like going on AIM. A bird told me. LOL." Sweetest Sin answered, "LOL. Seriously, was it one of the guys who were there or you guys saw him, followed him? Wow, Snoop. I can't forget the way you came, took out the gun and said 'What's up, fool?' LOL. Started shooting. Starting shooting." Snoop responded, "I got a call from somebody but I can't say who. LOL. What a scene, huh? Did you see dat fools terrifiedass face? He turned pale white. LOL. Couldn't pronounce nuttin. Scaredass bitchass fool." Sweetest Sin answered, "Wow, Snoop. I know it is. Don't trip. But it's cool. I can care less. I ain't talking to those [girls no more]. They [*19] think I set Ghost up. LOL. Fuck them." Snoopy answered, "It wasn't a girl. I'll tell you dat much. Tell your homegirl paytsar that she's fucking two-faced acting like she was my true homegirl and shit. Then I see her commenting. Dat bitch ass fool."

Case 2:24-cr-00214-MEMF   Document 42-1   Filed 05/20/24   Page 6 of 13   Page ID #:164

Page 6 of 13
2012 Cal. App. Unpub. LEXIS 3067, *19

The screen name changed to "Betta than your ex and going be better than your next" (Betta). Betta said, "You're cool, Snoop. Fuck, I was happy you were there shooting up Ghost. But you almost killed me and my sis. My sis was right in front of it, but I guess at that second you didn't fucking care who was there and shit. Huh? Whose car was that? Yours? You were alone huh? Ghost said Skinny was in it to che [Armenian for 'right']." Snoopy answered, "I was alone and yeah, I didn't care who was there. People should know it's better not to kick it with bitches like that."

The exhibits were admitted into evidence after the trial court asked the defense if they had any objection, and defense trial counsel answered no. The defense moved for dismissal for insufficient evidence ("[o]bviously, it's a self-defense case"), and the court granted the motion only as to the allegations under section 12022, subdivision (d), that Abrahamyan discharged a firearm [*20] causing great bodily injury.

### B. Defense evidence

Abrahamyan testified in his own defense. On June 26, 2007, he lived on Del Rey Avenue in Pasadena with his family. He had met Yuri in 2006 and they became friends, but seven or eight months later they argued when Yuri believed Abrahamyan was having an affair with the mother of Yuri's first child. Yuri stopped calling and coming around, and then started saying that he hated Abrahamyan and was going to kill him. On MySpace, Yuri made songs about Abrahamyan saying that when he saw him, he had something that would release him or kill him "'[o]n sight. Wherever I see you.'" Yuri also made a MySpace page with Abrahamyan's photograph and the words, "'Wanted seven, Snoopy.'" "Wanted seven" was code for murder. Abrahamyan started carrying a firearm because of the threats. He knew Yuri as a violent person and a police informant, who always carried a gun and bragged about shooting people.

A little more than a month earlier, on May 21, 2007, someone shot at Abrahamyan near his home on Del Rey in Pasadena. He was smoking a cigarette with a friend when Abrahamyan saw his friend's face freeze, and turned around to see a car moving slowly. Someone said, [*21] "'Fuck'" something and Yuri shot at Abrahamyan about 10 times. Abrahamyan fired back. The Pasadena police arrived, and Abrahamyan told them the shooter was a guy wearing a bandanna on his face, because he was afraid of Yuri.

On June 26, 2007, he drove a white Infiniti to Brand Park to drop off a friend. He had a gun with him. Abrahamyan dropped off his friend, leaving Harut (Skinny) sitting in the passenger seat. Abrahamyan saw Yuri there; he had not known Yuri would be at the park. Abrahamyan was near a black Cadillac when he saw Yuri walking toward the Infiniti with a black pistol in his hand. Yuri came right up to the passenger window pointing the pistol at Abrahamyan, and Abrahamyan fired shots to scare him away. He did not want to kill Yuri, so he fired down past Yuri's left shoulder. Abrahamyan drove away and threw the gun into the ocean.

Abrahamyan said that he was bragging in his chats on MySpace, because Yuri had "made me look like a bitch." When he shot at Yuri, Yuri was close enough to touch, and Abrahamyan could have hit him if he had wanted to. Abrahamyan did not go to the Glendale police, because he knew Yuri worked with them. Yuri had threatened Abrahamyan's mother and [*22] the rest of his family.

On cross-examination, Abrahamyan explained that he had been called "Snoopy" by his friends since he was 15 years old. During the Pasadena shooting, Abrahamyan had his gun in his waistband but didn't take it out until the car was even with him. He fired about five shots, not to hit the person in the car but to "get him off me" and make him stop shooting. Before that day, he had fired a gun with his cousin in Fresno. He had lied to the police on the day of the Pasadena shooting because he was terrified of Yuri. He had been convicted of felony vandalism in 2005, and so in 2007 on the day of the Pasadena shooting he was a felon in possession and didn't want the police to know he had a gun; he put the gun back in his waistband and did not tell them he had fired back.

The prosecutor read the following MySpace communication from exhibit 20, dated June 18, 2007: "'Hi, Snoopy. This is Pistol from LPS13. You liked how my bullet flies at you? Now we will eat you up with my new Tech 9 and the .45. Pick up your stupid phone and let's dump on each other face-to-face. Pick up on the 818 numbers.' To which you responded, 'Laughing my ass off, Fuck me. Dogs. Foo. Did you like [*23] my bullets flying at you bitchass fool? Anywhere I camp, you bitchass fool live. You fools are going to get it. Fucking punks fools are a joke. Bring a bitch with you to meet up. That shows how much bitch you got in you. My phone's tapped, so don't be calling trying to talk big on the phone. Know all you want to get me to get locked up

so you could read easy. Hit the kai-ez and let's see who gets who.'" Abrahamyan denied having that conversation.

Abrahamyan admitted that he had written, "'A little bird told me that Yuri was going to be there'" (at Brand Park), but said he was showing off because Yuri had made him look weak and cowardly. "I was trying to show them that I did something when in reality I didn't."

He kept the gun he used at Brand Park in the door panel of the Infiniti. As Abrahamyan pulled up toward the Cadillac, he took the gun out. When Yuri walked up to the car with his gun right at the window, Abrahamyan shot right next to him. Skinny was leaning back so that he would not get hit. Abrahamyan got a new gun the day after he threw the gun he used at Brand Park into the ocean; he was afraid of being caught with the gun he used to shoot at Yuri, because the police would take [*24] Yuri's side over his because Yuri was an informant.

Abrahamyan told people he was leaving town after the Brand Park shooting "[t]o make it look like I did something," but he stayed home to be safe because he feared that Yuri would come back and kill him. He had never shot anyone in his life. He was just trying to scare Yuri away.

Ayda Nazarian testified that she was at Brand Park near the basketball court in the early evening of June 26, 2007, and was interviewed by the police that same day. When she heard a gunshot, she saw a man in the playground area running to his car with a black gun in his hand. The car took off and followed a white Infiniti driven by Abrahamyan.

### C. Rebuttal

Detective Arthur Frank testified that from his analysis of the bullet holes, the bullets that hit the Cadillac were traveling at a horizontal angle to the vehicle, not from the top shooting down as previously described, and were shot from in front of the Cadillac rather than from the side. Detective Frank also testified that from Nazarian's position in Brand Park, she could have seen part of what she said she saw.

Officer Quintero testified that he found a handgun in a compartment of the right rear door of the [*25] Infiniti during the July 5, 2007 search of Abrahamyan's residence.

### D. Jury questions and juror recusal

During deliberations, the jury sent the following question: "What is the definition/criteria of 'intent to kill'?" With the agreement of the parties, the trial court answered that the jury should consider the instructions as a whole, and directed the jury to the instruction stating that any words with legal meanings would be defined in the instructions.

Later, one of the jurors asked to be recused. The juror stated: "Upon closer examination of reading the law and the different criteria for the charges, I cannot in good conscience, make a decision knowing what I'm restricted to or bound to." The trial court asked the juror whether she was willing to abide by the oath she took to decide the case only on the evidence presented and the instructions given by the court, and she responded, "No." The trial court discharged the juror and drew an alternate juror in her place. Shortly thereafter, the jury rendered its verdict.

Abrahamyan filed a motion for new trial, arguing in part that the admission of some of the MySpace conversations in exhibits 11 and 20 were more prejudicial than probative, [*26] and that there was insufficient evidence that Abrahamyan did not act in self-defense. After argument, the trial court denied the motion.

## DISCUSSION

### I. Sufficient evidence supported Abrahamyan's conviction for attempted willful, deliberate, and premeditated murder.

Abrahamyan argues that there was insufficient evidence that he did not act in either perfect or imperfect self-defense, contending that Yuri pointed a gun at him as he walked toward the Infiniti on the day of the Brand Park shooting.

Where, as in this case, the defendant asserts self-defense and has sufficiently raised "a reasonable doubt of his guilt of murder," the burden is on the prosecution to establish beyond a reasonable doubt that the defendant did not act in self-defense. (*People v. Rios (2000) 23 Cal.4th 450, 461-462, 97 Cal. Rptr. 2d 512, 2 P.3d 1066*). "When a factual circumstance negates an element of the crime, as imperfect self-defense negates malice, the federal Constitution's due process guarantee

requires the prosecution to bear the burden of proving the absence of that circumstance beyond a reasonable doubt." (*People v. Martinez (2003) 31 Cal.4th 673, 707, 3 Cal. Rptr. 3d 648, 74 P.3d 748* (conc. & dis. opn. of Kennard, J.).) Nevertheless, "'"[the] test on appeal is whether substantial [*27] evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.'"' [Citation.]" (*People v. Wright (1985) 39 Cal.3d 576, 592, 217 Cal. Rptr. 212, 703 P.2d 1106*.)

Our role in reviewing a sufficiency of the evidence claim is limited. (*People v. Smith (2005) 37 Cal.4th 733, 738, 37 Cal. Rptr. 3d 163, 124 P.3d 730*.) We examine the entire record in the light most favorable to the judgment, and determine whether the evidence is of such solid value that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Gonzales and Soliz (2011) 52 Cal.4th 254, 294, 128 Cal. Rptr. 3d 417, 256 P.3d 543*.) "'We presume "'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]"'" (*Ibid.*) We will reverse only if "'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citations.]'" (*People v. Hughes (2002) 27 Cal.4th 287, 370, 116 Cal. Rptr. 2d 401, 39 P.3d 432*.) Further, "[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja (1993) 4 Cal.4th 1134, 1139, 17 Cal. Rptr. 2d 375, 847 P.2d 55*.)

"Attempted murder [*28] requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee (2003) 31 Cal.4th 613, 623, 3 Cal. Rptr. 3d 402, 74 P.3d 176*.) "Traditional [perfect] self-defense applies where the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause the victim's death are necessary to avert the threat, and these beliefs are objectively reasonable. [Citation.]" (*People v. Curtis (1994) 30 Cal.App.4th 1337, 1357, 37 Cal. Rptr. 2d 304*.) "Self-defense negates culpability for assaultive crimes, whether or not the assault results in death." (*People v. Adrian (1982) 135 Cal.App.3d 335, 340, 185 Cal. Rptr. 506*.)

"A person who kills or tries to kill someone because he actually, but unreasonably, believes he needs to defend himself from imminent death or great bodily injury is deemed to have acted without malice. [Citations.] Under this unreasonable self-defense theory, the crime committed is manslaughter or attempted manslaughter, not murder or attempted murder. [Citation.]" (*People v. Szadziewicz (2008) 161 Cal.App.4th 823, 833-834, 74 Cal. Rptr. 3d 416*.)

There was conflicting evidence at trial whether Yuri carried a gun at Brand Park and [*29] pointed it at Abrahamyan while approaching the Infiniti. None of the four female witnesses who were in and near the Cadillac told the police that Yuri had a gun, in interviews on the day of the shooting or in later interviews. Sargsyan testified that he did not see Yuri with a gun that day. Yuri testified that although he habitually carried a firearm, on the day of the shooting he did not carry a gun, as he was just going to the park to see a female friend. Abrahamyan wrote MySpace messages stating, "I just wanna kill that fool," that "a bird told me" Yuri would be at the park that day, and bragging that Yuri was terrified and turned pale when he saw Abrahamyan. Further, nowhere in the MySpace communications was there a reference to Yuri having a gun at Brand Park. All four female witnesses who were in or near the Cadillac, however, testified for the first time at trial that Yuri pulled out a gun (or something that looked like a gun, or merely something) as he walked toward the Infiniti. Abrahamyan testified that Yuri walked toward the Infiniti with a gun and pointed it at Abrahamyan. Nazarian testified that from her position near the basketball court, she saw a man running to his [*30] car with a gun in his hand.

On this conflicting evidence regarding whether Yuri had and displayed a gun at Brand Park, and whether Abrahamyan therefore reasonably believed he needed to shoot to defend himself (for perfect self-defense) or actually (but unreasonably) believed he needed to defend himself (for imperfect self-defense), the jury could have concluded that Abrahamyan acted in perfect or imperfect self-defense. Nevertheless, the jury found Abrahamyan guilty of attempted murder, apparently disbelieving the testimony that Yuri had and displayed a gun. It is not our function to reassess the credibility of witnesses. (*People v. Thompson (2010) 49 Cal.4th 79, 125, 109 Cal. Rptr. 3d 549, 231 P.3d 289*.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young (2005) 34 Cal.4th 1149, 1181, 24 Cal. Rptr. 3d*

112, 105 P.3d 487.) [5] "Even [*31] if the evidence could be reconciled with a different finding, that does not justify a conclusion that the jury's verdict was not supported by the evidence, nor does it warrant a reversal." (*People v. Romero (2008) 44 Cal.4th 386, 400, 79 Cal. Rptr. 3d 334, 187 P.3d 56*.)

Construing, as we must, the evidence in the light most favorable to the judgment, we conclude that the evidence was sufficient to support the jury's finding that Abrahamyan was guilty of attempted murder, and did not act in perfect or imperfect self-defense.

**II. The trial court properly instructed the jury.**

Abrahamyan contends that the trial court erred in giving three jury instructions that were not supported by substantial evidence. He identifies CALCRIM 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor), CALCRIM 3472 (Right to Self-Defense May Not Be Contrived), and CALCRIM 3474 (Danger No Longer Exists or Attacker [*32] Disabled) as the offending instructions.

Abrahamyan admits that the record shows he did not object to the giving of these three instructions during trial. "Defendant's failure to object to the instruction below . . . forfeits the claim on appeal. [Citations.]" (*People v. Virgil (2011) 51 Cal.4th 1210, 1260, 126 Cal. Rptr. 3d 465, 253 P.3d 553*.)

Nevertheless, "an appellate court may review any instruction given even though no objection was made in the lower court if the substantial rights of the defendant are affected. [Citation.] The cases equate 'substantial rights' with reversible error, i.e., did the error result in a *miscarriage of justice*? [Citations.]" [Citation.]' [Citation.]" (*People v. Christopher (2006) 137 Cal.App.4th 418, 426-427, 40 Cal. Rptr. 3d 615*.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton (1993) 4 Cal.4th 1116, 1129, 17 Cal. Rptr. 2d 365, 847 P.2d 45*.) Each of the instructions challenged by Abrahamyan on appeal has application to the facts of the case; thus, no miscarriage of justice resulted.

---

[5] The jury was instructed: "The testimony of only one witness can prove any fact," and "If you determine there is a conflict in the evidence, you must decide which evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses."

**A. CALCRIM No. 3471**

CALCRIM no. 3471, as given, provides: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only [*33] if: [¶] (1) He actually and in good faith tries to stop fighting; [¶] (2) He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; [¶] AND [¶] (3) He gives his opponent a chance to stop fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

Abrahamyan argues that there was no substantial evidence that he engaged in mutual combat, "a violent confrontation conducted pursuant to prearrangement, mutual consent, or an expressed or implied agreement to fight." (*People v. Ross (2007) 155 Cal.App.4th 1033, 1036, 66 Cal. Rptr. 3d 438*.) Even assuming that there was insufficient evidence of mutual combat, the error was harmless. CALCRIM No. 3471 applies to a person who engages in mutual combat *or is the initial aggressor.* The instruction is correctly given where there is evidence that the defendant was the initial aggressor: "'[A] defendant who—through [*34] his own wrongful conduct, such as initiating a physical assault . . . created circumstances under which his adversary's attack or pursuit is legally justified may not invoke unreasonable self-defense.' [Citation.]" (*People v. Frandsen (2011) 196 Cal.App.4th 266, 273, 126 Cal. Rptr. 3d 640*.)

There was substantial evidence that Abrahamyan was the initial aggressor. Witnesses testified that Abrahamyan drove up to the Cadillac, slowed or stopped, and shouted something like, "What's up, bitch" or "What's up, homey." In his MySpace conversation with Vicki (Sweetest Sin), Abrahamyan said "a bird told me" that Yuri was at the park, and Vicki responded, "I can't forget the way you came, took out the gun and said, "What up, fool?" Yuri testified that someone in the Infiniti said something and he walked toward the car and answered; when he caught a glimpse of a gun, he began to run. The jury could reasonably have concluded that Abrahamyan was the initial aggressor and the first to brandish a gun. Even if the mutual combat portion of the instruction was inapplicable, "giving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."'

[Citation.]" (*People v. Cross (2008) 45 Cal.4th 58, 67, 82 Cal. Rptr. 3d 373, 190 P.3d 706*.) **[\*35]** Further, the jury was instructed "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts."

### B. CALCRIM no. 3472

CALCRIM no. 3472, as given, provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Again, as described above, there was evidence at trial that Abrahamyan knew Yuri would be at the park, drove the Infiniti up to the Cadillac, slowed or stopped, and shouted derogatory remarks from the car; when Yuri walked up and answered, Abrahamyan fired at Yuri. There was no error in giving this instruction.

### C. CALCRIM No. 3474

CALCRIM 3474, as given, provides: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." There was evidence at trial that Abrahamyan continued to shoot at Yuri as he fled. Yuri testified that the shots continued as he ran. Armine G. testified that the **[\*36]** person pointing the gun was shooting at Yuri and Armen as they went down the hill to the playground, and there was nobody standing next to the vehicle when the shots were fired. There was no error in giving this instruction. [6]

### III. The prosecutor did not commit misconduct.

Abrahamyan contends that the prosecutor committed misconduct during closing argument by misstating the law of self-defense and by referring to his postarrest silence. "A prosecutor's conduct violates the *Fourteenth Amendment to the federal Constitution* when it infects the trial with such unfairness as to make the conviction a denial of due process. . . . [T]he question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales (2001) 25 Cal.4th 34, 44, 104 Cal. Rptr. 2d 582, 18 P.3d 11*.)

"As **[\*37]** a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa (1997) 15 Cal.4th 795, 841, 64 Cal. Rptr. 2d 400, 938 P.2d 2*.) Recognizing that trial counsel did not object to any of the statements identified as prosecutorial misconduct, Abrahamyan characterizes counsel's failure to object as ineffective assistance of counsel. [7] Because we conclude that there was no misconduct, we need not consider the argument that trial counsel was deficient in failing to object and that the failure prejudiced Abrahamyan.

In closing, the prosecutor stated: "There's some other things the judge said and one is the person who engages in initial combat or is the initial aggressor, he talks about that, how they don't necessarily have the right to self-defense. [¶] I go up to you, know that you're armed, that you regularly carry guns and I go up with a gun, holler something out, showing that: I can show you. Initial aggression doesn't get you self-defense other than the conditions the court stated, and that's a person says that subsequently withdraws. They hope to get the other person to pull their gun. They say, 'Hey, wait. I don't want to fight. I don't want to do anything,' then they get to use self-defense."

This was not an incorrect statement of the law. The prosecutor argued that an initial aggressor does not have the right to use self-defense when, with a gun, he approaches another who he knows is armed and initiates a confrontation by yelling something, unless the initial aggressor tries to stop fighting and communicates

---

[6] As we find no error in the giving of the three instructions, we reject Abrahamyan's argument that the jury question about intent to kill and the recusal of one of the jurors demonstrate that error in giving the instructions resulted in prejudice to Abrahamyan.

[7] "'To establish ineffective assistance of counsel, a [defendant] must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the [defendant] to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the [defendant]. [Citations.] "A reasonable probability is a probability sufficient to undermine **[\*38]** confidence in the outcome." [Citation.]' [Citation.]" (*In re Jones (1996) 13 Cal.4th 552, 561, 54 Cal. Rptr. 2d 52, 917 P.2d 1175*.)

to the other that he no longer wants to fight. (See CALCRIM No. 3471 [initial aggressor **[*39]** has right to self-defense if "1. He actually and in good faith tries to stop fighting; 2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; [¶] AND [¶] 3. He gives his opponent a chance to stop fighting."].)

Abrahamyan also points to this statement by the prosecutor: "Before this trial the defendant was arrested back in July of 2007, and when the police said you're being arrested for attempted murder, at that point his defense wasn't to them: "Hey, a gun was pulled on me." It was, "Hey, I never fired a gun in my life." The defendant lied. He lied to the police. He lied to you." Abrahamyan argues this is an impermissible comment on his silence, that is, on his failure to claim self-defense.

The prosecution may not impeach a defendant's testimony at trial with evidence of his silence after being advised of his rights under Miranda v. Arizona (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]. (Doyle v. Ohio (1976) 426 U.S. 610, 617-618, 96 S. Ct. 2240, 49 L. Ed. 2d 91.) "An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context **[*40]** of the prosecutor's inquiry or argument. [Citation.] A violation of due process does not occur where the prosecutor's reference to defendant's postarrest silence constitutes a fair response to defendant's claim or a fair comment on the evidence." (People v. Champion (2005) 134 Cal.App.4th 1440, 1448, 37 Cal. Rptr. 3d 122.)

There was testimony at trial that after Abrahamyan was arrested for a probation violation and was being transported, he asked the officers why his probation was violated, and they replied that he was being booked for attempted murder. Abrahamyan then stated "he had never touched the gun in his life," although no one had mentioned a gun. There is no evidence that Abrahamyan had received *Miranda* warnings at this point, and there is no evidence that he invoked his right to remain silent. In addition, Abrahamyan was not silent; he chose to make a statement. The prosecutor's reference to Abrahamyan's statement was a fair comment on the evidence. The statement showed that Abrahamyan knew the attempted murder involved a gun, and the statement that Abrahamyan "never touched the gun in his life" was contradicted by the evidence at trial, including Abrahamyan's testimony that Abrahamyan customarily **[*41]** carried a gun and used it at Brand Park.

The prosecutor did not commit misconduct.

### IV. The trial court did not abuse its discretion in admitting People's exhibits 11 and 20.

We review the trial court's decision to admit evidence for an abuse of discretion, under which standard "'"a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (People v. Foster (2010) 50 Cal.4th 1301, 1328-1329, 117 Cal. Rptr. 3d 658, 242 P.3d 105.)

Exhibits 11 and 20 are transcriptions of MySpace communications. Exhibit 11 is 57 pages of sent messages retrieved from Abrahamyan's home computer. Exhibit 20 was three pages of MySpace communications between Abrahamyan and others referring to the earlier shooting in Pasadena.

Exhibit 11 was admitted into evidence after the trial court asked the defense if it had any objection, and defense trial counsel answered no. Later, after reviewing exhibit 11 during a recess in the defense case, defense counsel objected that a number of the MySpace chats "are not relevant to this case and it's prejudicial. So **[*42]** we're going to ask that the only thing that should come in are chats that pertain to this case." Counsel objected to Abrahamyan's chats with his girlfriend and chats about getting high. The prosecution responded that some pages might be relevant during cross-examination, and the court stated it would address the issue when testimony was concluded.

Exhibit 20 was introduced during the prosecutor's rebuttal. Defense counsel objected on foundational grounds, arguing that the author of the message about the Pasadena shooting ("Pistol from LPS13") was not known. The court asked counsel to raise the issue after rebuttal was complete. After rebuttal, defense counsel again objected that some of the MySpace conversations in exhibits 11 and 20 were not relevant to the case, such as a conversation between Abrahamyan and his girlfriend, and others were repetitive. The court asked both counsel to go through the exhibits and determine what parts were relevant.

After closing arguments and instructions to the jury, defense counsel detailed what parts of exhibit 11 should

Case 2:24-cr-00214-MEMF   Document 42-1   Filed 05/20/24   Page 12 of 13   Page ID #:170

Page 12 of 13
2012 Cal. App. Unpub. LEXIS 3067, *42

be excluded as irrelevant. The prosecution argued that the entire document had been introduced into evidence and the jury was expecting **[*43]** to get all of it; redacting parts of it now would cause the jury to wonder, and would affect the integrity of the exhibit. Even those conversations that the defense labeled irrelevant said nothing, and were not prejudicial. Further, all the conversations were relevant to show Abrahamyan's state of mind, as he had testified that he was in terrible fear during the time.

Defense counsel also objected that admission exhibit 20 would mislead the jury and cause it to speculate who sent the message about the Pasadena shooting (identified only as "pistol from LPS 13"). The prosecutor replied that it was relevant because Abrahamyan had testified about the earlier shooting and said the shooter was Yuri. It did not matter who sent the message to Abrahamyan; what was important was that nothing suggested that the message came from Yuri. Abrahamyan's response to the message seemed to acknowledge that he knew who the sender was, and the message therefore was relevant to Abrahamyan's credibility when he testified that Yuri was the shooter in the Pasadena shooting.

The court ruled as to exhibit 11: "In looking at these pages that [the] defense is asking to exclude, I don't see anything prejudicial and **[*44]** I follow the rule that you got to keep the total—it's like a transcript, you have to keep the total context of the conversations. [¶] . . . I don't see anything that would be prejudicial to the defense. So the previously admitted documents remain admitted." The court also admitted exhibit 20.

## A. Exhibit 11

On appeal, Abrahamyan argues that numerous sections on 17 pages of exhibit 11, [8] which contain profanity, references to drinking and drug use, and a graphic sexual reference, as well as sections that say "nothing at all" or something in Armenian, were irrelevant and should have been excluded. At trial, however, he objected only to nine pages: 2140, 2148, 2149, most of 2150, the first two paragraphs of 2151, the last half of 2157, and 2162, 2196, and 2197. We therefore consider only those pages of exhibit 11, because Abrahamyan's failure to make a timely and specific objection to any other pages forfeits his claim on appeal. (*People v. Geier (2007) 41 Cal.4th 555, 611, 61 Cal. Rptr. 3d 580, 161 P.3d 104*.)

The pages of exhibit 11 to which Abrahamyan objected at trial contain messages between Snoopy and a former girlfriend two days after the Brand Park shooting; messages four days after the shooting to "dO mE DoGGyStyLE" about a missed telephone call and plans to meet later, with references to oral sex; Snoopy's reference four days after the shooting to being "a lil buzzed"; the use of profanity ("mothafuckas"); references to parties; messages in Armenian; and what Abrahamyan calls irrelevant material. The last message was dated July 4, 2007.

None of this material has direct relevance to Abrahamyan's guilt or innocence, but as the prosecutor pointed out, to the extent that the conversations were routine, they were relevant to Abrahamyan's credibility that he was in such fear of Yuri during the time after the **[*46]** Brand Park shooting that he would not leave the house. Although the challenged portions of exhibit 11 refer to sexual activity and being "buzzed," and contain profanity, none of the references would have surprised the jury or prejudiced Abrahamyan. Profanity (which permeated the testimony at trial) and a reference to being "buzzed" would not be new to the jury, as similar references occurred in portions of exhibits to which Abrahamyan did not object, and which were read to the jury during the prosecution's case. Further, we disagree that Abrahamyan's reference to a sexual act in a bantering conversation would have invoked an emotional bias against him. Abrahamyan was charged with attempted murder, not a sex crime.

Abrahamyan also argues that some of exhibit 11 was cumulative, as the printout of the MySpace conversations was repetitive and contained strings of messages that included the earlier messages being responded to. His trial counsel, however, specifically stated that "one of the reasons we're not objecting [to pages of exhibit 11] is that they're just repeats of the other." And as we have concluded that the challenged portions of exhibit 11 had at least some relevance and

---

[8] Abrahamyan identifies as improperly admitted pages 2140, 2141, 2142, 2143, 2144, 2145, 2146, the top paragraph of 2147, 2148, 2149, the top paragraph of 2150, the first paragraph of 2151, the last paragraph of 2154, **[*45]** the last paragraph of 2157, 2162, the last paragraph of 2181, 2186, the last paragraph of 2189, the last paragraph of 2190, and 2196. Although we do not discuss in detail the pages of the exhibit to which counsel did not object, we have examined all the preceding pages, and reject Abrahamyan's additional argument that counsel's failure to object to them all was ineffective assistance.

were **[\*47]** not prejudicial, it is of no importance that some messages were repeated in the MySpace conversations.

**B. Exhibit 20**

Abrahamyan argues that the first page of exhibit 20 contains a May 7 reference to a third and different shooting, and that allowing that portion into evidence was irrelevant and prejudicial. At trial there was no specific objection to this portion of the exhibit on those grounds, and therefore Abrahamyan has forfeited that objection. In any event, the conversation includes Abrahamyan's statement that he did not know who was shot, and there is no indication that he was involved.

We conclude that it was not an abuse of discretion to admit exhibits 11 and 20.

**V. There was no cumulative error.**

Finally, Abrahamyan argues that he was denied due process and a fair trial by the cumulative effect of the errors he urges on appeal. We have concluded that there was no error, and therefore there was no cumulative error.

**DISPOSITION**

The judgment is affirmed.

JOHNSON, J.

We concur:

MALLANO, P. J.

CHANEY, J.

**End of Document**